UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA            )
                                    )
                                    )
                                    )
         v.                         )   Criminal No. 16-10023
                                    )
MARION GRIFFIN and GERALD SIBLEY,   )
                                    )
         Defendants.                )
                                    )
_____ )

## MEMORANDUM AND ORDER

**CASPER, J.**                                       **February 10, 2017**

### I.  Introduction

Defendant Marion Griffin ("Griffin") has moved to suppress a September 14, 2015 identification by a store clerk and any subsequent in-court identifications of him. D. 60. Defendants Griffin and Gerald Sibley ("Sibley") (collectively, the "Defendants") have also moved to dismiss Count II, charging a violation of 18 U.S.C. § 924(c)(1)(A). D. 62. Having considered the motion papers, the government's opposition, D. 75, the evidence and arguments presented at the motion hearing, D. 92, 106, and the parties' post-hearing briefs, D. 104-05, the Court DENIES Griffin's motion to suppress, D. 60, and DENIES the Defendants' motion to dismiss Count II.

### II.  Griffin's Motion to Suppress

#### A.  Findings of Fact

These findings are based upon the testimony presented at the evidentiary hearing and the exhibits introduced at that same hearing. D. 92, 106.

### 1. Robbery and Immediate Investigation

On the night of September 10, 2015, Emad Guirguis ("Guirguis") was working as a store clerk in the Village Market in Brookline, Massachusetts. D. 106 at 13. About twenty minutes before closing time, two men came to the store. Id. One remained outside and the other came into the Market. Id. The man who entered the store, removed a silver gun from his pocket and told Guirguis to give him money and the "lottery drawer." Id. at 13-14, 21, 25. To stall in hopes that a passerby might see, Guirguis pretended that he did not understand the command. Id. at 14, 25. As the robber persisted, Guirguis got behind the counter since he had "[n]o choice" but to comply. Id. He gave the man the money. Id. After doing so, the robber told him "[d]on't follow me when I go" and departed the store. Id. at 15. After his departure, the clerk called the police and the store owner. Id. at 15, 26. Guirguis described his interaction with the robber as lasting one minute to a minute and a half. Id.

Although Guirguis was looking at the gun during the course of the incident, D. 106 at 15, 17, 22-23, he saw his face and was able to provide a description of him. D. 106 at 15, 24. He described the robber as a black man, approximately 5'10," over age 40 wearing a black baseball hat, black jacket and black pants. Id. at 15, 23. Brookline officers then obtained surveillance footage of the incident from the Village Market store owner. D. 61 at 2; D. 75 at 1; Exh. 3. This footage shows a black male in black clothing and armed with a gun enter and rob the store. Exh. 3. According to the surveillance footage, the robbery lasted approximately 72 seconds. Id.

### 2. September 11, 2015 Identification Procedure

On September 11, 2015, the following day, Brookline police officers, Detective Lacy and Lieutenant Paul Cullinane ("Cullinane"), returned to the store to have Guirguis look at an eight-photo array. D. 106 at 16; D. 92 at 7; Exhibit 1. The photo array contained a photo of Griffin.

Detective Lacy, who had put the photographic array together based upon information that he had received from the Boston Police Department, D. 92 at 14, remained outside the store while Cullinane presented the array to Guirguis. Before showing the array, Cullinane read the instructions on the Brookline Police Department Photographic Show Up Admonition form to the Guirguis which included the instruction that the array may or may not include the robber. D. 92 at 9-10; D. 106 at 16-17, 32-33, 35. Cullinane showed the photographs to Guirguis sequentially, one photograph at a time. D. 92 at 10. Guirguis paused at photograph #5, the photograph of Griffin. D. 92 at 12. He did not identify that photograph as the robber, but after the second time reviewing the photographs, he said that this photograph looked like the robber, but that the robber's skin appeared darker than the photograph. D. 106 at 17, 36; D. 92 at 12-13. He said that he would have trouble identifying him since he was focused on the robber having a gun. D. 92 at 13.

### 3. *After Griffin's September 11, 2015 Arrest*

On September 11, 2015, Boston Police notified the Brookline detectives that they had placed Griffin and Sibley under arrest. D. 92 at 15. Cullinane saw Griffin later that day at the police station and noticed that his complexion was darker and he appeared thinner than his original photograph, the one that had been used as photograph #5 in the original array shown to the store clerk. D. 92 at 16.

### 4. *September 14, 2015 Identification Procedure*

On September 14, 2015, Brookline Detective Lacy, Lieutenant Burke and Detective Yu Kajita ("Kajita") returned to the Village Market to show Guirguis another photographic array including an updated photograph of Griffin. D. 92 at 27; D. 106 at 17-18. While the other two other officers waited outside, Kajita presented the second, eight-photograph array to Guirguis. D. 92 at 28. The officer followed the same procedure of reading the instructions and showing the

3

array (also prepared by Lacy, D. 92 at 32) to the store clerk on this occasion as had been done on September 11th. Id.; D. 106 at 18, 38. Kajita read the Brookline Police Photographic Show Up admonition form and showed Guirguis the new photo array. Exhibit 2. On this occasion, Guirguis immediately identified photograph #6—the photograph of Griffin—as the robber. D. 92 at 29; D. 106 at 18-19. He said "[i]t's him, it's him. That's the guy," when he got to this photograph. D. 92 at 29. He noted that he recognized him by his distinct eyes and nose. D. 92 at 30; D. 106 at 18, 38.

### B. Witness Identification

Identification evidence is governed by the due process clause of the Fifth Amendment. Manson v. Brathwaite, 432 U.S. 98, 113 (1977); United States v. Holliday, 457 F.3d 121, 125 (1st Cir. 2006). "To determine whether evidence procured as a result of a pretrial identification procedure should be excluded, a district court must conduct a two-pronged inquiry." United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993) (citations omitted). First, a court must assess whether the pretrial identification procedure was "impermissibly suggestive." Simmons v. United States, 390 U.S. 377, 384 (1968); de Jesus-Rios, 990 F.2d at 677. That is, the Court examines first whether the procedure itself was suggestive and second whether there was good reason for the failure to employ less suggestive procedures. Holliday, 457 F.3d at 125–26 (citations omitted). If a court concludes that the procedure was impermissibly suggestive, the Court must next assess whether, under the totality of the circumstances, the resulting identification was reliable despite the impermissibly suggestive procedure. Neil v. Biggers, 409 U.S. 188, 199 (1972); de JesusRios, 990 F.2d at 677; United States v. Maguire, 918 F.2d 254, 263 (1st Cir. 1990).

"[I]t is only in the extraordinary cases that identification evidence should be withheld from the jury." Maguire, 918 F.2d at 264 (quoting United States v. Turner, 892 F.2d 11, 14 (1st Cir.

4

1989)). That is, "[t]he standard being applied is meant to screen out only evidence that is clearly unreliable and not to supplant the jury's ordinary function of weighing what the witness says and choosing the weight to accord it." United States v. Jones, 689 F.3d 12, 18 (1st Cir. 2012).

       *1.  Photo Identification Procedure Was Not Impermissibly Suggestive*

Griffin contends that the photographic identification procedure was impermissibly suggestive because the police presented two photo arrays on consequent occasions to Guirguis in which the only individual shown in both arrays was Griffin. D. 61 at 11. There is, however, no *per se* bar to presenting multiple arrays to a witness that contains a singular individual's photograph in both as was the case here, Maguire, 918 F.2d at 263 ( noting that "[a] suspect's inclusion in two photo spreads, even with the same photo, is not constitutionally impermissible") (citations omitted). Instead, the Court must assess the suggestiveness of the identification procedure on a case-by-case, considering the particular facts and circumstances of this particular case. Here, Garguis was properly advised that, among other things, each array may or may not contain the robber. Most significantly, there was a legitimate, investigative reason for the police to show the store clerk a second array containing a different photograph of Griffin. Garguis did in fact focus on Griffin's photograph in the first array, indicating that he looked like the robber, but that the robber had darker skin than the photograph of Griffin. As the police knew, the photograph of Griffin in this array was older and observation of Griffin's appearance post-arrest suggested that a more recent photograph should be an accurate portrayal of him. Accordingly, after obtaining a more current photograph, the police showed Guirguis showed him a second array containing this photograph and given him the same precautionary instructions. It was from this photographic array, containing a more updated photograph, that Guirguis, have previously said that Griffin's

5

2014 photograph in the first array looked like the robber, now definitively identified Griffin as the robber.

### 2. *The Identification Was Nonetheless Reliable*

Even if the Court had concluded that the identification procedure was impermissibly suggestive (which it has not), the Court must then next determine that the resulting identification was nonetheless reliable. Biggers, 409 U.S. at 199; de Jesus-Rios, 990 F.2d at 677; Maguire, 918 F.2d at 263. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to review the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199–200. The Court, however, is "not required to accord each factor equal weight or to even consider all five factors," but must decide whether the identification is reliable under the totality of the circumstances. United States v. Garcia-Alvarez, 541 F.3d 8, 14-15 (1st Cir. 2008). Having considered the relevant factors in the totality of circumstances, the Court concludes that the identification was reliable.

    a) <u>Opportunity to View</u>. Although Guirguis was not surprisingly focused on the robber's gun, he was nonetheless in close contact with the robber, see D. 106 at 20-21 (describing distance from robber as "[a] couple of steps"), D. 106 at 49, one-on-one, during their brief interaction. Although he wore a hat, the robber's face was not otherwise obscured and the store clerk got a good look at him. D. 106 at 50.

    b) <u>Degree of Attention</u>. The Court acknowledges and has considered the testimony of Dr. Margaret Kovera regarding the factors that may

6

adversely affect the reliability of eyewitness identification including the stress of the situation and the presence of a weapon. D. 106 at 62-63. Neither party disputes that stress can affect the circumstances in which a witness makes observations and may be a factor to consider when considering the reliability of a later identification. The law has recognized as much in regard to consideration of the Biggers factors. See United States v. Arthur, 764 F.3d 92, 102 (1st Cir. 2014) (noting that "stress can hamper eyewitness identification" and that "an eyewitness, though highly certain, may sometimes be mistaken"); see also Young v. Conway, 698 F.3d 69, 81 (2d Cir. 2012) (noting that "the scientific literature indicates that the presence of a weapon during a crime 'will draw central attention, thus decreasing the ability of the eyewitness to adequately encode and later recall peripheral details'" and that "high levels of stress have been shown to induce a defensive mental state that can result in a diminished ability accurately to process and recall events, leading to inaccurate identifications") (citations omitted). Such consideration, however, does not warrant a conclusion that any identification made under such circumstances is unreliable or that the one made in this case was unreliable, but that the Court should consider the impact of such circumstances. See D. 106 at 83 (Kuvera testifying that, for example, some people appear not to be affected by the "weapon effect" and different people have different reactions to stress); see D. 106 at 109. Against such consideration, the Court has also considered

Guirguis's testimony regarding his ability to observe the robber and the other <u>Biggers</u> factors.

c) <u>Description of Robber</u>.  Guirguis's description of the robber included his race, height (both as 5'10" and in comparison to his own height), age (in his 40s), clothing (black hat, black jacket and black pants). The Court, however, recognizes the limitations of Guirguis's description; as explained in <u>Smith</u>, the description is broad enough to encompass a wide array of individuals such that "its breadth limits its use in this analysis." <u>Smith</u>, 429 F. Supp. 2d at 452.

d) <u>Confidence in Identification</u>.  The Court acknowledges that a "witness' lack of confidence is certainly a reliable warning sign, while the presence of confidence is probably closer to a neutral factor." <u>Jones</u>, 689 F.3d at 18. Although Guirguis stated that he may not be able to make an identification because he was focused on the gun, Griffin's photograph in the first array caught his attention and he noted that the individual looked like the person who had robbed the market but had a darker complexion, D. 61-5 at 3. When shown the second photo array with an updated photograph of Griffin, Guirguis immediately recognized him as the robber and noted his recognition of certain of Griffin's facial features. D. 61-8 at 2-3. Here, Guirguis's confidence level does not, therefore, undermine the reliability of his identification.

e) <u>Time Lapse Between Crime and Identification</u>.  The short period, five days between the robbery and Guirguis's identification of Griffin, further

persuades the Court that his identification was reliable. See Brathwaite, 432 U.S. at 115–16 (concluding that the witness's identification was reliable in part because the identification took place only two days later); Goodine, 2001 WL 823644, at *2 (holding the identification reliable in part because "[t]he length of time between the crime and the viewing of the photographs was only four days"); Levasseur v. Pepe, 70 F.3d 187, 195 (1st Cir. 1995) (concluding that, under the circumstances, a six-month lapse between the crime and the witness's identification was outweighed by the strength of the other reliability factors. This is particularly true here where even a day after the robbery, although he did not definitively identify Griffin's photograph as the robber, Guirguis indicated that Griffin's photograph looked like the robber.

Having considered the totality of circumstances here, the Court concludes that Guirguis's identification is reliable and may be presented to the jury at trial to be given what weight, if any, they choose.

### C. Future In-Court Identification

Because the Court concludes that an out-of-court photo identification procedure was not unduly suggestive or unreliable, any in-court identification, if proffered, need not be suppressed. Smith, 429 F. Supp. 2d at 452–53. While there is "concern that the later in-court identification would be tainted by the earlier, improper, out-of-court identification," a witness's in-court identification is permissible if the Court concludes that the in-court testimony is nevertheless reliable. Smith, 429 F. Supp. 2d at 448-49, 453; United States v. Gomez Pizarro, 364 F. Supp. 2d 56, 68 (D.P.R. 2005). "[T]he touchstone of this analysis is the question of whether the earlier out-

9

of-court identification 'has proven so impermissibly suggestive' as to vitiate the reliability of the later in-court identification and 'give rise to a very substantial likelihood of misidentification.'" Smith, 429 F. Supp. 2d at 448–49 (quoting Maguire, 918 F.2d at 264-65). Because the out-of-court photographic identification procedure was not impermissibly suggestive and Guirguis's identification was otherwise reliable, there is no earlier taint that would threaten the reliability of Guirguis's future in-court identification.

### III. Defendants' Motion to Dismiss

#### A. Discussion

Count II of the indictment charges Defendants with using, carrying and brandishing a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). D. 62. Defendants contend that the Hobbs Act robbery charged in Count I—which is incorporated as the underlying crime of violence for Count II—does not qualify as a predicate offense under 18 U.S.C. § 924(c)(3) because it does not fall under the force clause of 18 U.S.C. § 924(c)(3)(A) and 18 U.S.C. § 924(c)(3)(B), the residual clause, is unconstitutional. D. 63 at 1-2. Defendants contend that Count II should thus be dismissed. Id.

Section 924(c)(1)(a) creates an enhanced punishment for any defendant who uses, carries or possesses a firearm during the course of a crime of violence. 18 U.S.C. § 924(c)(1)(A). 18 U.S.C. § 924(c)(3) defines what types of offenses can constitute the predicate "crime of violence." This statute defines a "crime of violence" as a felony that:

> *(A)* Has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> *(B)* That by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Id. § 924(c)(3). Section 924(c)(3)(A) is known as the "force clause" while section 924(c)(3)(B) is referred to as the "residual clause." United States v. McCallister, No. 15-cr-0171-ABJ, 2016 WL 3072237, at *2 (D.D.C. May 31, 2016).

The indictment in this matter charges Defendants with a violation of the Hobbs Act:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The statute further defines robbery as:

> the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1).

1. Section 924(c)(3)(A) Force Clause

To constitute as a crime of violence under the force clause, a Hobbs Act robbery must categorically have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The Court employs the categorical approach to make this determination. United States v. Hill, 832 F.3d 135, 139 (2d Cir. 2016) (citing Taylor v. United States, 495 U.S. 575, 600 (1990)). Under the categorical approach, the Court determines whether the minimum criminal conduct necessary for conviction under a particular statute constitutes a crime of violence by looking only to the elements of the offense and without considering the actual underlying facts of the matter at hand. Id. (citations omitted).

11

The weight of authority militates against concluding that a Hobbs Act robbery is not a crime of violence under the force clause. Although the First Circuit has not squarely addressed whether a Hobbs Act robbery constitutes a crime of violence under the force clause, United States v. Pomerleau, No. 07-cr-115-DBH, 2016 WL 6471202, at *2 (D. Me. Nov. 1, 2016), it has treated this crime as a predicate crime of violence under § 924(c). See United States v. Morales-Machuca, 546 F.3d 13, 21 (1st Cir. 2008) (explaining that "[a] violation of the Hobbs Act is a crime of violence for purposes of this statutory provision"); United States v. DeCologero, 530 F.3d 36, 67–69 (1st Cir. 2008) (affirming conviction under § 924(c) for using or carrying a firearm during and in relation to a predicate Hobbs Act robbery). This is further supported by the reasoning in the district courts of this circuit. For instance, the Williams court explains that "every method of committing a Hobbs Act robbery, as defined in the statute, involves the use, attempted use, or threatened use of physical force against the person or property of another." United States v. Williams, No. 15-cr-00069-JDL, 2016 WL 1555696, at *1 (D. Me. Apr. 15, 2016); see Craig v. United States, No. 01-CR-00003-GZS-3, 2016 WL 5874965, at *5 (D. Me. Oct. 7, 2016) (same); see also Chasse v. United States, No. 15-CV-473-PB, 2016 WL 4926154, at *1 (D.N.H. Sept. 15, 2016) (holding that federal bank robbery and pharmacy robbery both constitute crimes of violence under the force clause of § 924(c)).

Moreover, courts across the country increasingly have held that a Hobbs Act robbery is a crime of violence under § 924(c)'s force clause. See Hill, 832 F.3d at 138, 144; United States v. Howard, 650 F. App'x 466, 468 (9th Cir. 2016), as amended (June 24, 2016); In re Fleur, 824 F.3d 1337, 1340–41 (11th Cir. 2016); United States v. Coleman, No. 14-cr-664, 2016 WL 1435696, at *2 (N.D. Ill. Apr. 12, 2016); McCallister, 2016 WL 3072237, at *7; United States v. Clarke, 171 F. Supp. 3d 449, 453 (D. Md. 2016); United States v. Steele, No. 14-CR-147-WBHLTW, 2016

WL 4059714, at *7-*9 (N.D. Ga. June 21, 2016), report and recommendation adopted, No. 1:14-CR-0147-WBH, 2016 WL 4036843 (N.D. Ga. July 28, 2016); United States v. Davis, No. 12-cr-00119-SI, 2016 WL 6473074, at *3–4 (N.D. Cal. Nov. 2, 2016) (collecting cases). This Court finds the weight of this authority persuasive.

Accordingly, the Court concludes that the Hobbs Act robbery charge in Count I qualifies under the force clause as a crime of violence under § 924(c)(3)(A) and is a proper predicate offense from which to charge 18 U.S.C. § 924(c)(1)(A). Having reached this conclusion, the Court need not reach the issue of whether the residual clause of same is unconstitutional in light of Johnson II.

For these reasons, the Court denies Defendants' motion to dismiss Count II. D. 62.

**IV.    Conclusion**

For the foregoing reasons, Griffin's motion to suppress, D. 60, is DENIED and the Defendants' motion to dismiss, D. 62, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge